UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

* * *

| | |
|---|---|
| BEN F. CLARK, an individual,<br><br>Plaintiff,<br><br>v.<br><br>GARY CAMPBELL, an individual; ALEX RANGEL, an individual; LANDER COUNTY, a political subdivision of the State of Nevada; and HUMBOLDT COUNTY, a political subdivision of the State of Nevada; KYLE NEGUS, an individual;<br><br>Defendants. | 3:14-CV-00333-LRH-WGC<br><br>ORDER |

Before the court is Defendants' Motion for Summary Judgment. Doc. #48.[1] Plaintiff Ben F. Clark ("Clark") filed an Opposition (Doc. #52), to which Defendants' replied (Doc. #54).

**I. Facts and Procedural History**

Clark is a resident of Lander County and has been involved in an ongoing dispute with his next door neighbors, Marvin and Gloria Hughes. In 2012, Clark installed an alarm system to retaliate against the Hughes' barking dogs. On June 23, 2012, the Hughes called the Lander County Sheriff's Office to make a complaint. When Defendants Gary Campbell and Alex Rangel, both Lander County Deputy Sheriffs, arrived on the scene, the Hughes explained the situation to them.

After learning the specifics of the Hughes' complaint, the deputies explained they could not arrest Clark, but explained the Hughes could perform a citizen's arrest. They then went to

[1] Refers to the Court's docket number.

speak with Campbell. Campbell and Rangel approached an open rear door and proceeded to knock on the building.

Clark approached the open door with a .357 Magnum revolver in his hand. The deputies pulled their weapons and ordered Clark to put the gun down. Clark refused their repeated commands, responding in a belligerent manner and hurling obscenities at the deputies. Rangel holstered his pistol and attempted to use a taser against Clark. Clark was then shot by Campbell. This was all documented on the deputies' body cameras.

After being shot once in the abdomen, Clark retreated into his residence and engaged in a standoff with additional officers. He repeatedly refused their instructions to exit the residence and receive immediate medical attention. After several hours, Clark finally left the residence, but did so contrary to the manner he had agreed on with the police. When Clark refused commands to stop, put his hands on his head, and drop to the ground, he was subdued by Humboldt County Deputy Sheriff Kyle Negus, using two drag-stabilized bean bags from a 12-gauge. Campbell was then arrested and treated for his injuries.

On June 23, 2014, Clark filed his initial complaint (Doc. #1), and on October 13, 2014, he filed an amended complaint (Doc. #4). He filed a second amended complaint on April 10, 2015, alleging seventeen claims for relief: (1) Fourth Amendment Use of Force (42 U.S.C. § 1983) against Rangel and Campbell for the shooting; (2) Fourth Amendment Use of Force (42 U.S.C. § 1983) against Rangel and Campbell for the taser application; (3) First and Second Amendment Retaliation (42 U.S.C. § 1983) against Rangel and Campbell; (4) Battery against Rangel, Campbell, and Negus; (5) Intentional Infliction of Emotional Distress against Rangel, Campbell, and Negus; (6) Trespass against Rangel and Campbell; (7) Vicarious Liability via *Respondeat Superior* for the state torts against Lander and Humboldt Counties; (8) Municipal Liability via Final Policymaker *Monell* claim (42 U.S.C. § 1983); (9) Negligent Supervision/Retention against Lander County; (10) Conspiracy for Unlawful Arrest with the Hughes against Rangel and Campbell; (11) Arrest without Probable Cause against Rangel and Campbell; (12) False Arrest against Rangel and Campbell; (13) False Imprisonment against Rangel and Campbell; (14) Malicious Prosecution and Malicious Prosecution Plus against

Rangel, Campbell, and Lander County; (15) Trespass against Rangel and Campbell; (16) False Arrest against Rangel and Campbell; and (17) False Imprisonment against Rangel and Campbell.

On August 28, 2015, Defendants filed the present motion for summary judgment (Doc. #48). On October 5, 2015, Clark filed his response. Doc. #52. On October 22, 2015, Defendants filed their reply. Doc. #54.

**II. Legal Standard**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp*., 236 F.3d 1148, 1154 (9th Cir. 2001). A motion for summary judgment can be complete or partial, and must identify "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). On an issue as to which the nonmoving party has the burden of proof, however, the moving party can prevail merely by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case. *Celotex*, 477 U.S. at 323.

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record that demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248.

Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id*. at 252. "[S]peculative and conclusory arguments do not constitute the significantly probative evidence required to create a genuine issue of material fact." *Nolan v. Cleland*, 686 F.2d 806, 812 (9th Cir. 1982).

**III. Discussion**

**A. Fourth Amendment Use of Force**

Defendants argue that deadly force was justified because Clark approached the officers in a belligerent and aggressive manner with a gun in his hand. He refused their repeated requests to put the gun down, and after he was tased, they saw him move in a threatening manner. Plaintiff argues that the force used was excessive because there was no crime afoot and Clark did not verbally threaten the officers or point his gun at them.

To sustain an action under section 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right. *Rinker v. County of Napa*, 831 F.2d 829, 831 (9th Cir.1987) (citing *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981)).

Because this case involves claims of excessive force in violation of the Fourth Amendment, the constitutional analysis is governed by the "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Determining whether a particular use of force is reasonable under the Fourth Amendment "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865

(internal citation and quotation marks omitted).  The use of deadly force is reasonable "if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir.1994) (quoting *Garner*, 471 U.S. at 3, 105 S.Ct. 1694.); *see also Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 906 (9th Cir.2007).  Determining whether an officer's use of force was reasonable requires consideration of all the circumstances known to the officer, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.  Moreover, the reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir.2001) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).  The court must allow for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.89.

The analysis of the use of intermediate force, like a taser, is quite similar to the analysis for the use of deadly force.  The use of a taser in dart mode qualifies as an intermediate level of force, which "must be justified by a strong government interest that compels the employment of such force."  *Lindsay v. Kiernan*, 378 F. App'x 606, 608 (9th Cir. 2010).  The reasonableness of the application of intermediate force is tested in much the same way as the application of lethal force.  *Id*.  "To examine the government's interest in the use of force, this court considers (1) whether the suspect poses an immediate threat to the safety of the officers or others; (2) whether the suspect is actively resisting; and (3) the severity of the initial offense."  *Id*.

Further, "the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them."  *Scott*, 39 F.3d at 915.  "Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment.  In the heat of battle with lives potentially in the balance, an officer would not be able to rely on training and common sense to decide what would best accomplish his mission.

Instead, he would need to ascertain the least intrusive alternative (an inherently subjective determination) and choose that option and that option only. Imposing such a requirement would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves. It would also entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment. Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Id*.

The amount of force the officers applied was appropriate in this case. Clark appeared to pose a significant threat to the officers. He approached them with a loaded .357 revolver in his hand, and he refused more than 60 requests to put the gun down. While the officers were generally calm and reasonable in their conduct with him, Clark grew increasingly belligerent throughout the encounter. He began shouting, he categorically refused to put the gun down, he used curse words and racial epithets, and he moved toward the officer before the officer tased him. All this is evident from the video. Additionally, it is uncontested that the Plaintiff was moving the gun around in his hands while he was talking. A suspect does not have to be primed to fire a weapon before an officer is allowed to use deadly force. *Moore v. City of Selma, Ala*., No. CIV.A. 14-212-CG-C, 2015 WL 4073245, at *7 (S.D. Ala. July 6, 2015) ("Police should not have to wait until suspects fire or might fire a weapon before using deadly force"); *see also Garczynski v. Bradshaw*, 573 F.3d 1158, 1169 (11th Cir. 2009) ("At least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force"). Moreover, the officers testified that after the tase Clark was moving his arms, and Campbell saw Clark put his finger inside the trigger guard before Campbell made the decision to shoot.

This case is similar to other cases where the courts found the use of lethal force reasonable. In *Moore*, the court found reasonable force where an armed young man repeatedly disobeyed police commands to drop his gun and was shot after moving suddenly. In *Estate of Martinez v. City of Fed. Way*, 105 F. App'x 897, 898 (9th Cir. 2004), the court found the use of force reasonable when an armed man was "intoxicated, belligerent, and ignored repeated

commands by the officers to drop his gun," even though the officers didn't see him put his finger on the trigger. The Court held that "[w]hether Martinez's finger was on the trigger is irrelevant. Even if Martinez's finger was not on the trigger, it would only take a fraction of a second for him to place it there." *Id.*

Finally, Plaintiff's expert also makes the argument that the officers should have retreated initially instead of engaging with Clark, but the 9th Circuit has held that officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Scott*, 39 F.3d at 915.

Because Clark behaved in a way that showed him to pose an immediate threat to the safety of the officers and he refused their repeated commands to put his gun down, the Court finds that the use of both intermediate and deadly force was justified in this case. Accordingly, the Court grants Defendant's motion for summary judgment as to the two use of force claims.

**B. First and Second Amendment Retaliation**

Defendants argue that there is no evidence whatsoever that Campbell and Rangel exercised any force upon Clark in retaliation for protected activity. Clark argues Rangel and Campbell used force against him in retaliation for his First Amendment activities (his speech directed toward the deputies) and his Second Amendment activities (his speech about his Second Amendment rights).

"To demonstrate retaliation in violation of the First Amendment, [Plaintiff] must ultimately prove first that [Defendants] took action that would chill or silence a person of ordinary firmness from future First Amendment activities.... The second requirement is [that] ... [Plaintiff] must ultimately prove that [Defendants'] desire to cause the chilling effect was a but-for cause of [Defendants'] action" *Skoog v. County of Clackamas*, 469 F.3d 1221, 1231-32 (9th Cir.2006) (internal quotation marks and footnote omitted).

Here, Clark cannot establish causation. Clark's argument is that "given the proximity in time between the known protected activity and the taser and shooting, a reasonable inference exists that the latter were motivated by the former." This conclusory statement simply isn't enough. Plaintiff provides no actual evidence to suggest that the officers were motivated by a

desire to halt Plaintiff's free speech. Further, in Plaintiff's own deposition, when asked about the retaliation claim, he stated that he was not shot in retaliation, but "I was shot by two Keystone cops. That's why I was shot." Doc. #48.

Further, Plaintiff admits Judge Montero's Order established probable cause through issue preclusion. Doc. #52. Although probable cause is not dispositive in cases that are not retaliatory prosecution claims, the 9th Circuit does consider it to be of "high probative force." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008) (quoting *Hartman v. Moore*, 547 U.S. 250, 265-66, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006)). Moreover, the Ninth Circuit further held that cases with very strong evidence of probable cause and very weak evidence of a retaliatory motive should not survive summary judgment. *Id*. "There is almost always a weak inference of retaliation whenever a plaintiff and a defendant have had previous negative interactions; holding that this case survives summary judgment would provide almost no protection for government officials from the disruption caused by unfounded claims." *Id*. (internal quotations omitted).

Additionally, Plaintiff states that their claim for retaliation against Plaintiff's exercise of his Second Amendment rights is also couched in his First Amendment rights, stating "Plaintiff's theory is the use of excessive force as it relates to the taser and Campbell's shooting was to squelch the Second Amendment tirade, not to deprive him of his right to bear arms." Doc. #52. Thus, the same analysis applies. Therefore, the Court grants Defendant's motion for summary judgment as to the retaliation claim.

**C. Battery**

Defendants argue that they are not liable for battery because their use of force was justified. Clark argues that Defendants are guilty of battery because their conduct meets the elements of a battery claim.

"To establish an assault claim, a plaintiff must show that the actor (1) intended to cause harmful or offensive physical contact, and (2) the victim was put in apprehension of such contact." *Burns v. Mayer*, 175 F.Supp.2d 1259, 1269 (D.Nev.2001) (citing Restatement (Second) of Torts, § 21 (1965)). "To establish a battery claim, a plaintiff must show that the actor (1) intended to cause harmful or offensive contact, and (2) such contact did occur." *Id*.

(citing Restatement (Second) of Torts, §§ 13, 18). Furthermore, "[u]nder Nevada law, a police officer is privileged to use the amount of force reasonably necessary." *Vasquez–Brenes Las Vegas Metro. Police Dep't*, 51 F.Supp.3d 999, 1014 (D. Nev. 2014) (citing *Yada v. Simpson*, 913 P.2d 1261, 1262 (Nev.1996), superseded by statute on other grounds as recognized by *RTTC Commc'n, LLC v. Saratoga Flier, Inc*., 110 P.3d 24, 29 (Nev.2005)). However, "[a]n officer who uses more force than is reasonably necessary is liable for battery." *Id*.; *see also Ramirez v. City of Reno*, 925 F.Supp. 681, 691 (D. Nev.1996) (applying Nevada law). Accordingly, the standard for battery by a police officer under Nevada law is the same as under a § 1983 claim. *Vasquez–Brenes*, 51 F.Supp.3d at 1014; *see also Ramirez*, 925 F.Supp. at 691 ("The standard for common-law assault and battery by a police officer thus mirrors the federal civil rights law standard ....").

The Court has already ruled above that Rangel and Campbell were justified in their use of force, thus they are not liable for battery. As to Negus, this Court rules that he was also justified in his use of intermediate force against Clark. Clark, a man known to be armed, had just emerged from his residence after an hours long standoff in a manner contrary to the agreed upon plan. He then refused the officers' explicit directions to stop, put his hands on his head, and drop to the ground. He posed a danger to the officers, and Negus used the minimum force necessary to get Clark to comply. Accordingly, this Court grants Defendants' motion for summary judgement for the battery claim.

**D. Intentional Infliction of Emotional Distress**

Defendant argues that the Intentional Infliction of Emotional Distress claim cannot stand because the officers' actions were justified. Clark argues that the officers' conduct was sufficiently outrageous to sustain the claim.

To recover for the intentional infliction of emotional distress, a plaintiff must establish the following elements: (1) that the defendant's conduct was extreme and outrageous; (2) that the defendant either intended or recklessly disregarded the causing of emotional distress; (3) that the plaintiff actually suffered severe or extreme emotional distress; and (4) that the defendant's conduct actually or proximately caused the distress. *Star v. Rabello*, 97 Nev. 124, 625 P.2d 90

(1981). In order for conduct to be extreme and outrageous it must be "outside all possible bounds of decency and [ ] regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent–A–Car,* 953 P.2d 24, 26 (Nev.1998) (internal quotation marks omitted).

Here, Clark has pointed to no part of the record to demonstrate that the officers acted with the intent to cause, or reckless disregard for causing, emotional distress. In a rapidly evolving situation, the officers responded with appropriate force to deal with a potential threat. Accordingly, this Court grants Defendants' motion for summary judgment on the Intentional Infliction of Emotional Distress claim.

**E. Trespass**

Defendants argue that there was no trespass because the gate to Clark's residence was open, and they were within their rights to conduct a "knock and talk." Clark argues that the officers committed trespass because they entered Clark's land and remained there.

It is "permissible for officers to approach a home to contact the inhabitants." *United States v. Perea-Rey*, 680 F.3d 1179, 1187-88 (9th Cir. 2012). "The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home." *Id.* "Officers conducting a knock and talk also need not approach only a specific door if there are multiple doors accessible to the public, they may approach any part of the building where uninvited visitors can be expected." *Id.*

The officers did not trespass on Clark's land because they were lawfully present. Clark admits he did not have any "no trespassing signs," and the officers entered through an open gate (as shown by the video) to speak with Clark as part of their investigation into the Hughes' citizen arrest complaint. Therefore, there was no trespass. Accordingly, this Court grants the Defendants' motion for summary judgment on the trespass claims.

**F. *Monell* Claim**

The plaintiff has consented to the dismissal of this count.

**G. Negligent Supervision and Retention**

The plaintiff has consented to the dismissal of this count.

### H. Conspiracy for Unlawful Arrest

Defendants argue that there was no conspiracy for unlawful arrest with the Hughes because the officers acted appropriately in explaining and investigating a potential citizen's arrest.

In Nevada, a private person may arrest another "[f]or a public offense committed or attempted in the person's presence." NRS. 171.126. Prior to effectuating the arrest, officers must conduct additional investigation on a citizen's arrest "in order to establish independent probable cause prior to effectuating that arrest." *Hopkins v. Bonvicino*, 573 F.3d 752, 775 (9th Cir. 2009).

Clark cannot show a conspiracy existed here. After responding to the Hughes' phone call, the officers explained to them the procedure for making a citizen's arrest, which the Hughes said they wanted to do. The Hughes had complained of, among other things, loud music and a sounding alarm, which were audible when the officers arrived on the scene. In proceeding to Clark's property to speak with him, the officers were conducting the independent investigation required of them. Accordingly, this Court will grant Defendants' motion for summary judgment as to his claim.

### I. Arrest without Probable Cause, False Arrest, False Imprisonment, and Malicious Prosecution

Clark admits that Judge Montero's Order established probable cause through issue preclusion. Doc. #52.

The existence of probable cause vitiates any claim of unlawful arrest, false imprisonment, or malicious prosecution, regardless of whether the defendant had malicious motives for seeking a plaintiff's arrest. *Pierson v. Ray*, 386 U.S. 547 (1967); *Wyatt v. Cole*, 504 U.S. 158, 165 (1992); *Schertz v. Waupaca Cnty.*, 875 F.2d 578, 582 (7th Cir. 1989); *Sudderth v. City & Cnty. Of San Francisco*, 2001 WL 764929 (N.D. Cal. 2001); *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995); *Beauregard v. Wingard*, 362 F.2d 901, 903 (9th Cir. 1966); *Turner v. Cnty. Of Washoe*, 759 F. Supp. 630, 633 (D. Nev. 1991).

Because Plaintiff has admitted probable cause has been established, there can be no claim for unlawful arrest, false imprisonment, or malicious prosecution under federal law. Therefore, this Court grants Defendants' motion for summary judgment as to these claims. Additionally, Clark has consented to the dismissal of the malicious prosecution plus claim.

**J. Vicarious Liability via *Respondeat Superior***

Defendants argue that there is no vicarious liability because the officers did nothing to give rise to it. Clark argues that vicarious liability exists because of the intentional acts of the officers.

Because no claims remain, there can be no vicarious liability arising from them. Accordingly, this Court grants Defendants' motion for summary judgment as to the vicarious liability claim. Further, because there are no remaining claims, it is unnecessary to address the arguments on qualified immunity, discretionary function immunity, and discovery abuse.

**IV. Conclusion**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. #48) is GRANTED. The Clerk of Court shall enter judgment in favor of Defendants, and against Plaintiff Clark.

IT IS SO ORDERED.

DATED this 20th day of November, 2015.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE